# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>JUSTIN L. ANDERSON,<br><br>                Defendant. | Case No. 1:18-po-00428-SAB<br><br>ORDER DENYING DEFENDANT'S MOTIONS TO STRIKE<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS IN PART AND GRANTING IN PART<br><br>(ECF Nos. 38, 40, 44, 46) |

Currently before the Court is Defendant Justin Anderson's ("Defendant" or "Anderson") motion to suppress evidence, and Defendant's motion to strike the United States of America's ("Plaintiff" or the "Government") opposition to Defendant's motion to suppress. Defendant's motions were heard on April 26, 2019. Counsel Jeffrey Spivak appeared on behalf of Plaintiff and counsel Erin Snider appeared on behalf of Defendant. This matter was submitted following oral argument at the hearing and was taken under advisement. Having considered the moving, opposition, reply, supplemental opposition, supplemental reply, the exhibits attached thereto, and evidence and arguments presented at the April 26, 2019 hearing, the Court issues the following order.

///

///

# I.

# BACKGROUND

### A.    Procedural Background

On December 20, 2018, Defendant was issued a citation for possession of methamphetamine in violation of 21 U.S.C. § 844(a), and a citation for possession of a firearm in violation of 38 C.F.R. § 1.218(b)(37). (information now- see February 2019)  The citations were filed with the Court on December 21, 2018.  (ECF Nos. 1, 2.)[1]  Defendant made an initial appearance on December 21, 2018, and plead not guilty.  The Court ordered Defendant to make an appearance on February 7, 2019, and set conditions of release.  (ECF No. 5.)  On February 6, 2019, the Government charged Defendant with one count of possession of a controlled substance on VA property in violation of 38 C.F.R. § 1.218(b)(18), and one count of possession of a firearm on VA property in violation of 38 C.F.R. § 1.218(b)(37).  (ECF Nos. 9, 10.)

On February 8, 2019, U.S. Pretrial Services filed a petition with the Court describing Defendant's failure to comply with the requirement to appear for drug testing on January 25, 2019.  (ECF No. 12.)  On February 13, 2019, the Court set a contested hearing for February 20, 2019, and imposed an additional pretrial release condition requiring Defendant to report telephonically on dates including February 18, 2019.  (ECF No. 14.)  On February 19, 2019, U.S. Pretrial Services filed a petition with the Court detailing Defendant's failure to comply with the requirement to make a telephonic report on February 18, 2019.  (ECF No. 17.)  On February 19, 2019, the Court issued an arrest warrant for Defendant due to the violation of the pretrial release conditions.  (ECF No. 18.)  The warrant hearing regarding the pretrial release violation set for February 21, 2019, was not held due to Defendant's failure to make an appearance.  A contested hearing and initial appearance regarding the pretrial service violation set for February 27, 2019, was not held due to the failure of Defendant to make an appearance.  On February 27, 2019, the Court issued an arrest warrant for Defendant due to the failure to appear.  (ECF No. 32.)

On February 28, 2019, Defendant was arrested pursuant to the arrest warrants issued, and

---

[1]  References to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

1   Defendant was temporarily detained pending the next hearing.  (ECF Nos. 27, 28, 29, 30.)  A

2   status hearing was held on March 6, 2019, at which the Defendant admitted to the violation of

3   the pretrial release condition violation.  The Court then held a detention hearing and issued a

4   detention order to commit Defendant into custody.  (ECF No. 36.)

5         At the March 26, 2019 hearing, a briefing schedule was set for Defendant to file a motion

6   to suppress.  Defendant filed the instant motion to suppress on March 21, 2019.  (Def.'s Mot.

7   Suppress ("Mot."), ECF No. 38.)  The Government filed an opposition to the motion to suppress

8   on April 5, 2019.  (Pl.'s Opp'n Def.'s Mot. Suppress ("Opp'n."), ECF No. 39.)  On April 11,

9   2019, Defendant filed a reply to the Government's opposition.  (Def.'s Reply Opp'n ("Reply"),

10  ECF No. 41.)  On April 11, 2019, Defendant also filed a motion to strike the Government's

11  opposition for untimeliness.  (ECF No. 40.)  On April 14, 2019, the Government filed an

12  opposition to Defendant's motion to strike.  (ECF No. 42.)  On April 15, 2019, Defendant filed a

13  reply to the Government's opposition to Defendant's motion to strike.  (ECF No. 43.)  On April

14  25, 2019, at 10:57 p.m. on the evening immediately prior to and less than twelve hours before the

15  scheduled hearing set for the next morning at 10:00 a.m., the Government filed a supplemental

16  opposition to Defendant's motion to suppress.  (ECF No. 44.)  The Court conducted an

17  evidentiary hearing on April 26, 2019, during which Defendant Justin Anderson testified, in

18  addition to officers Michael Woodard and George Munoz.  At the evidentiary hearing, the Court

19  inquired of the Defendant how much time was necessary to file a reply addressing the

20  Government's late-filed supplemental opposition.  Per the Defendant's response, the Court gave

21  the Defendant until May 2, 2019 to file a reply.  On May 2, 2019, the Defendant filed a timely

22  reply to the Government's supplemental opposition.  (ECF No. 46.)

23        **B.    Factual Background**

24        The Court summarizes that facts as presented by Defendant and the Government in their

25  respective briefing, largely based on the declaration of Defendant, the reports from the involved

26  officers, and the surveillance footage.

27        On December 20, 2018, Defendant went to the Veterans Affairs Medical Center ("VA")

28  located at 2615 E. Clinton Ave. in Fresno, California, for the purpose of obtaining a new veteran

identification card.  (Mot. 2; Decl. of Justin L. Anderson ("Anderson Decl.") ¶ 2, ECF No. 38-2.)
Defendant was driving a black Cadillac and was accompanied by a "distant acquaintance," Eric
Garcia ("Garcia").  (Mot. 2; Anderson Decl. ¶ 3.)  Defendant and Garcia arrived at the VA
around 11:43 a.m. and parked in the fifth stall from the east in the second row of Lot B.  (Mot. 2;
Ex. A at 12:43-12:52; Ex. B at 1.)  After parking, Defendant began researching hotels in the
Fresno area using the app hotels.com, as Garcia had asked for help in finding a hotel.  (Mot. 2;
Anderson Decl. ¶ 4.)

Approximately eight minutes after arriving at the VA, Garcia told Defendant that he was
going to jump out and smoke a cigarette, and Defendant advised Garcia to go the sidewalk
because the VA does not allow smoking, and Garcia walked across the parking lot and began
smoking on the street corner off of VA property.  (Mot. 3; Anderson Decl. ¶ 5; Ex. A at 20:30-
21:27.)  Approximately five minutes after leaving the vehicle (twelve minutes after arriving at
the VA), Garcia returned to the car.  (Mot. 3; Ex. A at 24:04-25:46.)

At approximately 12:00 p.m., VA police officers Michael Woodard ("Woodard") and
George Munoz ("Munoz") were patrolling the VA facility on foot.  (Woodard Report, ECF No.
38-3; Mot. 3.)  A VA volunteer approached the officers and reported seeing two men in a black
Cadillac in the parking lot that looked suspicious, and the officers responded to investigate the
report.  (Id.)  After locating the vehicle, Woodard approached the driver, Defendant Anderson,
and Munoz approached the passenger, Garcia.  (Id.; Munoz Report, ECF No. 38-3; Ex. A at
32:42-32:51.)  Munoz noticed that Garcia had a paw print tattoo and a letter "B" tattoo on his
face, which Munoz knew to be consistent with the Fresno Bulldogs street gang.  (Munoz Report.)
Woodard saw the "B" tattoo which he recognized to consistent with the Bulldogs gangs,
specifically the Bond Street subset of the gang.  (Woodard Report.)

Woodard approached the driver's side window, which was rolled down, and according to
Defendant, Woodard identified himself and stated to Defendant: "Don't make any quick
movements.  Put your hands on the steering wheel."  (Anderson Decl. ¶ 6.)  On the other hand,
the Court notes that Officer Woodard's report states that:

I approached the driver side of the vehicle to conduct a consensual contact with

the driver . . . I asked Anderson if I could speak with him and he stated, "Sure." I asked what he was up to and Anderson stated, "I'm here to try and get a new veteran ID."

(Woodard Report.)

Defendant, who was holding a cell phone, states he complied by reaching toward the wheel and setting his phone on the dashboard. (Anderson Decl. ¶ 6.) Munoz instructed Garcia to place his hands on the dashboard. (Id.) Woodard asked why Defendant was at the VA, and Defendant stated he was trying to get a new veteran's ID card and also showed Woodard a photo of his veteran's ID card on his cell phone. (Woodard Report; Anderson Decl. ¶ 7.) Woodard responded by stating Defendant and Garcia did not "look" like veterans and that the situation looked suspicious. (Anderson Decl. ¶ 7.)

Munoz, while speaking with Garcia, smelled a strong odor of marijuana coming from the inside of the vehicle and told Woodard that he smelled marijuana. (Munoz Report.) Munoz asked if there was marijuana in the vehicle, and Garcia admitted to having a bag of marijuana in his sweatshirt pocket. (Id.) Munoz also observed a green plastic bag sticking out of Garcia's sweatshirt, and a noticeable bulge on the front of the sweatshirt. (Id.) Munoz asked Garcia whether he was on probation or parole, and Garcia responded he may be on probation, and when Munoz asked if Garcia had any weapons, Garcia responded he did not. (Id.) Munoz ordered Garcia to exit the vehicle and Garcia was frisked then handcuffed. (Id.; Ex. A at 36:15-37:47.)

Woodard asked Defendant if there were any drugs in the vehicle, and Defendant responded no. (Woodard Report.) According to Defendant, Woodard opened the driver's side door, grabbed Defendant's arm, and ordered him out of the vehicle. (Anderson Decl. ¶ 8; Ex. A at 37:47-37:58.) The Court notes that on the other hand, Woodard's report states that: "I asked Anderson to step out of the vehicle and face away from me to conduct a pat down for any weapons for officer safety purposes." (Woodard Report.) Woodard instructed Defendant to face the vehicle, grasped Defendant's fingers behind his back, and told Defendant he was going to conduct a pat down for weapons for officer safety purposes. (Woodard Report.) While Woodard performed a search of Defendant by patting down the outside of his clothes, Woodard felt an item with a "stem with a bulbous end" in the front right pant pocket, and according to

Defendant, when Woodard asked what it was, Defendant responded: "That is not a weapon." (Id.; Ex. A at 37:58-40:57; Anderson Decl. ¶ 8.)  According to Woodard's report, after feeling the item, Woodard, through his "training and experience," believed it to be a methamphetamine pipe, while Defendant "spontaneously stated, 'It's a meth pipe.' " (Woodard Report.)

Munoz advised Woodard that he had observed an empty gun holster on the floorboard of the front passenger seat where Garcia had been, and signaled for Woodard to place Defendant in handcuffs.  (Woodard Report; Ex. A at 37:58-40:57.)  Woodard advised Defendant that he was being detained, and placed Defendant in handcuffs.  (Woodard Report.)  Munoz then advised Defendant and Garcia that he was going to conduct a search of the vehicle.  (Id.; Munoz Report.) According to Officer Woodard, Defendant spontaneously stated: "I have crystal meth on the side of my door," and: "I also have ammunition on the side of the door." (Woodard Report.)  Munoz asked Defendant and Garcia whether there were firearms located in the vehicle and both denied that there were.  (Munoz Report.)  VA Criminal Investigator Joseph Torres ("Torres") ran Defendant's criminal history and indicated that Defendant had a criminal history of firearms. (Id.)

Over the next two hours, VA police, later joined by Fresno Police Department ("FPD") officers, conducted a search of the vehicle.  (Ex. A at 40:57-2:30:30.)  In the driver's side door panel, Munoz located a box of 9mm metal jacket rounds of ammunition, a six round .40 caliber Smith and Wesson magazine loaded with six hollow point .40 caliber rounds, as well as "a large orange pharmaceutical pill bottle with a white top that contained a large crystalline rock wrapped in clear packaging material believed to be methamphetamine." (Munoz Report; Ex. A at 42:22-44:20.)  Officers also found a black ski mask, a vehicle lock out kit pump to open doors, various tools, and what appeared to be stolen mail and checks.  (Munoz Report.)

During the search, Defendant remained handcuffed, generally sitting on the ground surrounded by law enforcement officers.  (Mot. 6; Ex. A at 40:57-2:30:30.)  At some point during the search, an officer read Defendant his Miranda rights using a card he pulled from his pocket or wallet.  (Anderson Decl. ¶ 10.)  According to Defendant, when asked if he understood his rights, Defendant responded: "I'm not going to talk without an attorney." (Id.)  According to

Woodard, at approximately 1:02 p.m., he separately read Defendant and Garcia their <u>Miranda</u> rights from VA form 1430, and Defendant and Garcia both separately stated they understood their rights and that they were both willing to answer questions. (Woodard Report.) Despite the fact that the form requires the suspect to sign the form if they consent, the Government concedes that Woodard did not have either suspect sign the form. (Opp'n 3.)

Woodard continued the search and found a loaded black Smith and Wesson M&P Shield .40 caliber hand gun "in the front passenger seat rear pocket." (Woodard Report; Ex. A at 1:19:38-1:19:50.) A weapons check found no information of an owner of the firearm. (Woodard Report.) According to Munoz, sometime after the firearm was located Defendant told officers that he wanted a lawyer. (Suppl. Report of Munoz, Ex. B, ECF No. 39-2.) In Munoz's supplemental report, he states:

> Due to the time lapse from when this incident occurred, I do not recall exact details as far as verbatim statements and the exact moment when Anderson invoked, but I do recall when [Woodard] read Anderson and Garcia their Miranda rights. I recalled that they both stated they understood and that they initially stated they would cooperate . . . Later in our investigation, between the discovery of the loaded firearm and locating a locked container in the trunk, I recalled Anderson invoking his right to an attorney. VA Police discontinued any further questioning toward Anderson.

(<u>Id.</u>)

During the search, VA police Lieutenant Gilbreth made contact with the registered owner of the vehicle, Enterprise rental car company. (Munoz Report.) Enterprise indicated that the car had been rented by a "Mitchell Alvarado" with an address on Bond Street, in Fresno, California. (<u>Id.</u>) Munoz called one of the two phone numbers listed on the rental contract, and the cell phone that was located on the dashboard of the vehicle began ringing. (<u>Id.</u>) Among the items found on the driver's side door of the car was a wallet with an Arizona driver's license for Mitchell Alvarado. (<u>Id.</u>) Munoz ran the driver's license through dispatch, and the license came back as female, further indicating that it was possibly a fraudulent driver's license and that the vehicle was likely rented fraudulently. (<u>Id.</u>)

In the trunk of the vehicle, officers located a large black container with a yellow lid and four padlocks sealing the container. (Woodard Report.) Woodard asked Defendant what was

inside the container, and Defendant invoked his right to remain silent by stating that he did not want to answer. (Id.) When asked if he could look inside the trunk, Defendant said no. (Id.) Officer Torres instructed Woodard to cut the locks on the container, and Woodard told Defendant that he was going to cut the locks. (Id.) Defendant then stated: "Don't cut the locks, the keys for the locks are on my key chain." (Id.) Woodard then retrieved the keys and opened the four locks. (Id.) Inside the container, officers located a number of items related to fraud and credit card forgery. (Id.)

After a period of time of over two hours while officers performed a search of the vehicle, officers pulled Defendant off the ground and escorted him to a marked FPD vehicle. (Ex. A at 2:50-26-02:50:43.) In the vehicle, Defendant, while handcuffed, was greeted by Detective Caleb Janca ("Janca"). (Ex. F, Interview with Detective Janca ("Janca Interview"), at 00:26-00:39.) Janca introduced himself and said: "I know you've talked to some other people out here. I know you've said something about wanting an attorney." (Id.) Janca then read Defendant his Miranda rights and questioned him about the contents of the vehicle. (Id. at 00:39-26:05.) Approximately twenty-six (26) minutes into the interview, Defendant stated: "I would just like to talk to my lawyer first, but I'll give it to you." (Id.) Janca then continued to question Defendant for another forty-five minutes. (Mot. 6.)

According to Munoz, Janca advised him that Defendant admitted under Miranda that the firearm located in the vehicle was in fact his. (Munoz Report.)

Following Janca's interrogation of Defendant, VA police took Defendant to the Fresno County Jail, where Defendant was booked on simple possession of a controlled substance and possession of a firearm on VA property. (Mot. 6.) On December 22, 2018, officers conducted an inventory search of the vehicle and returned the car to Enterprise. On December 28, 2018, officers received Enterprise records that confirmed that Defendant had rented the vehicle in the name of Mitchell Alvarado. (Suppl. Report of Munoz, Enterprise contract, and photographs, Ex. C, ECF No. 39-3.)

///

///

## II.

## LEGAL STANDARD

### A.    Fourth Amendment Search and Seizure

In relevant part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Morgan v. United States, 323 F.3d 776, 781 (9th Cir. 2003) (quoting Florida. v. Jimeno, 500 U.S. 248, 250 (1991)).  Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).

The Supreme Court has sustained the long-standing rule that "evidence seized during an unlawful search could not constitute proof against the victim of the search."  Wong Sun v. United States, 371 U.S. 471, 484 (1963).  This exclusionary rule is the principal remedy to deter violations of the Fourth Amendment and encompasses both the "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality."  Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)).

The Supreme Court created the exclusionary rule as a sanction to bar the prosecution from introducing evidence that was obtained by way of a Fourth Amendment violation.  U.S. v. Phillips, 9 F.Supp.3d 1130, 1133 (E.D. Cal. 2014).  The exclusionary rule is a "prudential" doctrine that is not a personal constitutional right nor is it designed to redress the injury from an unconstitutional search.  Davis v. United States, 564 U.S. 229, 236 (2011).  Rather, the sole purpose of the exclusionary rule is to deter future Fourth Amendment violations.  Id. at 236-37. The exclusionary rule takes a "costly toll upon truth-seeking and law enforcement objectives" and is only applied "where its deterrence benefits outweigh its substantial societal costs."  Hudson v. Michigan, 547 U.S. 586, 591 (2006) (internal quotations and citations omitted).

"When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 143 (2009)).

Law enforcement officers may, consistent with the Fourth Amendment, engage in brief investigatory stops if the officers have reasonable suspicion that an individual is engaged in criminal activity. United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)). "Reasonable suspicion" exists where officers, based on the totality of the circumstances, have a "particularized and objective basis for suspecting legal wrongdoing." Id. (internal quotations and citations omitted).

"Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court," and "[a]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue." United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (citations omitted).

### B.   Fifth Amendment Right to Counsel

Under Miranda v. Arizona, 384 U.S. 436, 474 (1966), an individual "has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. 477, 482 (1981). A person is in "custody" when, under the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave. Yarborough v. Alvarado, 541 U.S. 652, 662-63 (2004). Interrogation includes words or actions on the part of the police that are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

A waiver of the Miranda rights must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444. To determine the validity of a Miranda waiver, courts analyze the totality of the circumstances. Moran v. Burbine, 475 U.S. 412, 421 (1986). Once a suspect invokes his right to counsel, "interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474. The request for counsel must be unambiguous and to determine whether a suspect actually invoked his right to counsel courts look to whether "a reasonable police officer

in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994).

### III.

### DISCUSSION & ANALYSIS

#### A.    Defendant's Motion to Strike the Government's Opposition

As a preliminary matter, the Court must address the Defendant's motion to strike.  On March 6, 2019, the Court set a schedule for the filing of a motion to suppress in this matter, setting the date for the Government to file an opposition as April 4, 2019.  The Government did not file their opposition to Defendant's motion to suppress until April 5, 2019, one day after the deadline set by the Court.  (ECF No. 39.)  On April 11, 2019, Defendant filed a motion to strike the Government's opposition for untimeliness.  (ECF No. 40.)  On April 14, 2019, the Government filed an opposition to Defendant's motion to strike.  (ECF No. 42.)  On April 15, 2019, Defendant filed a reply to the Government's opposition to Defendant's motion to strike. (ECF No. 43.)

The local rules govern the filing of criminal motions, and provide that: "No party will be entitled to be heard in opposition to a motion at oral argument if that party has not timely filed an opposition to the motion."  L.R. 430.1.  Defendant requests the Government's opposition be stricken and that the Court decline to hear any argument at the April 26, 2019 hearing, citing United States v. Picou, Case No. 1:14-mj-00196-SAB-1, 2015 WL 6163423, at *2-3 (E.D. Cal. Oct. 19, 2015); cf. United States v. Smith, 506 F. App'x 600, 602, n.3 (9th Cir. 2013).  (ECF No. 40.)

While not using the words "excusable neglect," the Government responds that the "late filing was due entirely to a calendaring error" by the Government's counsel, who states he "mistakenly entered the government's deadline as April 5, 2019 . . . in both [his] paper calendar and [his] digital outlook calendar."  (ECF No. 42.)  The Government urges the Court to use its discretion to accept the late filing, U.S. v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009); Lutz v. Delano Union Sch. Dist., 2009 WL 25257609, *3 n.2 (E.D. Cal. Aug. 7, 2009).  (ECF No. 42.)

In reply, Defendant argues that the "government offers no explanation for why it

calendared the deadline on the wrong day," and argues "[u]nexplained calendaring errors do not constitute excusable neglect," citing <u>Wei v. Hawaii</u>, 763 F.2d 370, 372 (9th Cir. 1985). (ECF No. 43.)

In <u>Picou</u>, the undersigned granted Defendant's motion to strike the Government's opposition because the Government's explanation for the late filing, which was five days late, had no plausible foundation in the realities of the briefing schedule and associated advancements in that case. <u>See Picou</u>, 2015 WL 6163423, at *3. The undersigned also noted that while the Government did not argue excusable neglect under Federal Rule of Criminal Procedure 45(b)(1)(B), the Court would have rejected any such argument for the same reason that the government's excuse was not plausible. In <u>Smith</u>, a key factor in the Ninth Circuit's decision upholding the lower court's decision that the government's newly raised arguments were forfeited, was the prejudice to defendant due to new arguments raised by the government, and the fact that there was no excuse for the delay, given the arguments were "available to the government throughout the entirety of the proceedings." 506 F. App'x at 602, n.3. In <u>Wei</u>, counsel failed to serve a party within the 120-day time limit prescribed by Rule 4(j) of the Federal Rules of Civil Procedure, and the Ninth Circuit upheld the lower court's decision rejecting counsel's affidavit as failing to demonstrate the required showing under the good cause standard. <u>Wei</u>, 763 F.2d 370.

In contrast here, the Government's filing was only one day late, and Government's counsel's explanation along with other circumstances demonstrate excusable neglect. To determine whether a party's failure to meet a deadline constitutes "excusable neglect," the Court considers four factors: 1) the danger of prejudice; 2) the length of the delay and its potential impact on the proceedings; 3) the reason for the delay, including whether it was in the reasonable control of the party; and 4) whether the party acted in good faith. <u>Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership (Pioneer)</u>, 507 U.S. 380, 395 (1993).[2]

---

[2] While <u>Pioneer</u> involved bankruptcy proceedings, the Ninth Circuit and others have utilized this test in a variety of circumstances for the excusable neglect standard. <u>See United States v. Foster</u>, 178 F.3d 1301 (9th Cir. 1999) (extension of time for Rule 4(b)(4) criminal appeal); <u>Ahanchian v. Xenon Pictures, Inc.</u>, 624 F.3d 1253, 1261 (9th Cir. 2010) (Rule 60(b)); <u>Iopa v. Saltchuk-Young Bros., Ltd.</u>, 916 F.3d 1298, 1301 (9th Cir. 2019) (noting that "[w]e and our sister circuits have adopted the Supreme Court's four-factor test" in a variety of contexts, and upholding

Defendant does not identify any prejudice, and the Court cannot discern any. The length of the delay was only one day, and the Defendant has not identified any impact on the proceedings, and the Court cannot discern any. The reason for the delay was a simple mistake on the part of the counsel for the Government, and given counsel's declaration, appears to have been made in good faith. Balancing these factors, the Court is guided to exercise its discretion by permitting the late filing, and permitting the Government to be heard at the hearing. Accordingly, Defendant's motion to strike the Government's opposition brief shall be denied. (ECF Nos. 39, 40, 42, 43.)

**B.  The Government's Supplemental Opposition Brief Challenging Standing**

1.  <u>Defendant's Motion to Strike the Government's Supplemental Opposition</u>

The evening before the hearing on the motion to suppress, the Government filed a supplemental opposition to Defendant's motion to suppress. (Suppl. Opp'n Def.'s Mot. Suppress ("Suppl. Opp'n"), ECF No. 44.)

At the hearing, Defendant argued that the Court should strike the Government's late-filed supplemental opposition, stating that this supplemental opposition was even more untimely than the first opposition, filed a full two weeks after the initial opposition was due, and gave Defendant less than twelve hours to address what Defendant contends are new arguments not raised in the initial opposition. At the hearing, the Government argued the initial opposition did extensively discuss the issue of the stolen rental car, including attaching the rental documents and associated evidence, however concedes the briefing did not previously argue a lack of a reasonable expectation of privacy. Counsel for the Government stated that while preparing for the hearing the night before, he "stumbled" across the <u>Byrd</u> case discussing a reasonable expectation of privacy for rental vehicles. <u>United States v. Byrd</u>, 138 S. Ct. 1518 (2018). At the hearing, the Court took Defendant's request to strike the supplemental opposition under

---

ALJ's use in a regulatory context); <u>United States v. McConnell</u>, No. 2:14CR00001-009, 2015 WL 2365628, at *1 (W.D. Va. May 18, 2015) (noting that while the Fourth Circuit has not addressed what constitutes excusable neglect under Rule 45(b)(1)(B) for the purpose of late-filed Rule 33 motions, the Fourth Circuit has noted excusable neglect has the same meaning throughout the federal procedural rules, and noting that the Supreme Court implicitly extended the <u>Pioneer</u> factors to criminal cases in <u>Stutson v. United States</u>, 516 U.S. 193, 196–97 (1996)).

submission, and granted Defendant time to file a substantive reply to the supplemental opposition and also address the question of excusable neglect on the motion to strike the Government's supplemental opposition, and Defendant filed such reply on May 2, 2019. (ECF No. 46.)

In the reply filed, Defendant emphasizes that the supplemental opposition was not filed until 10:57 p.m. on April 25, 2019, two weeks after the deadline for the original opposition, and less than twelve hours prior to the hearing.[3]  Defendant argues the supplemental filing raises new legal arguments, and the Government's excuse that they had not encountered this theory until preparing for the April 26 hearing does not establish excusable neglect.  Defendant argues that he was prejudiced by the late filing, as the Government not only filed new authorities, but presented an entirely new argument, which the Defendant was unable to prepare for to address at the hearing, and states he was deprived of the opportunity to develop a record as to the issue because of insufficient time to prepare.  (Id. at 2.)  While Defendant doesn't believe the late filing was in bad faith, Defendant argues the length of the delay, two weeks after the original opposition was due, and the Government's reason for the delay which is essentially a failure to find certain research previously, weighs against finding excusable neglect.

The Court agrees that the filing of the late supplemental opposition was prejudicial to the Defendant's ability to adequately prepare to address the issue at the evidentiary hearing.  The Court gave the parties adequate time to file and address their respective briefing and this issue of whether the rental vehicle was obtained through fraud was quite apparent and known by the Government when their first opposition was filed, and thus the Government's reason for the late filing is less than compelling.  While the Court agrees that the timing of this late filing on the evening before the hearing is a serious concern for the Court, here, the Court strongly emphasized at the evidentiary hearing that the motion to suppress involved a wide range of legal issues and factual disputes, and counsel were advised that any and all factual issues should be

---

[3]  It should be noted that while it was less than twelve hours to "prepare" for the hearing such was not in fact that case since the time in which the pleading was filed until the hearing itself included the late evening and morning hours which the Court would not consider hours to prepare, especially when the issue was an additional theory against suppression.

addressed during the evidentiary hearing in order to ensure no aspects were left unaddressed that may be necessary to resolve all the legal issues in this matter. The Court also inquired about and granted Defendant the amount of time requested in order to file a brief in reply to the Government's late filed supplemental opposition, and Defendant did so.

While Defendant argues prejudice because of an inability to prepare to address the Government's new argument at the hearing, and was deprived of an opportunity to develop a record as to this issue, the Court finds the potential prejudice has been rectified through the thoroughness of the factual issues addressed at the evidentiary hearing, and through allowing Defendant to file a reply addressing the substantive legal issues presented in the Government's supplemental opposition. Additionally, in the reply briefing, Defendant does not identify any factual issues that were not adequately addressed during the evidentiary hearing and does not identify any issues with the evidence introduced at the hearing which may concern the question of lawful possession of the rental vehicle.[4]

For these reasons, while Defendant was prejudiced at the time of the filing of the late supplemental opposition as to a theory but not as to the development of the factual record, such prejudice has been extinguished by allowing the Defendant the opportunity to file a reply. Therefore, the Court can properly consider the legal arguments addressed in the parties' supplemental briefing in relation to the factual record that was fully developed at the evidentiary hearing. Further, as discussed herein, while the Court agrees with the substantive argument raised in the supplemental briefing, that Defendant did not have a reasonable expectation of privacy in the vehicle, such decision does not alter the ultimate disposition as to the Defendant's motion to suppress as the Court finds no violation of the Fourth Amendment for additional and alternative reasons as discussed herein.

     2.    <u>Substantive Discussion of the Government's Standing Challenge</u>

The Government argues that because Defendant apparently rented the vehicle in question under false pretenses, Defendant had no reasonable expectation of privacy in the car. (ECF No.

---

[4] In fact, the facts as to the stolen vehicle were addressed in the original opposition, it was merely the legal issue which the defendant was not allowed to adequately prepare for by the late supplemental opposition.

44; ECF No. 39-3.)  The Government cites to the recent Supreme Court case of <u>Byrd v. United</u> <u>States</u>, which stated the following:

> The central inquiry at this point turns on the concept of lawful possession . . . <u>Rakas</u> makes clear that wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search.  A burglar plying his trade in a summer cabin during the off season, for example, may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as legitimate.  Likewise, a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile.  No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car.

<u>Byrd v. United States</u>, 138 S. Ct. 1518, 1529–30, 200 L. Ed. 2d 805 (2018) (internal citations and quotations omitted); <u>see also</u> <u>United States v. Cunag</u>, 386 F.3d 888, 894 (9th Cir. 2004) ("Prior to <u>Rakas</u>, the Ninth Circuit mistakenly held that the driver of a stolen car enjoyed the protection of the Fourth Amendment in a search of the car . . . [i]n <u>Rakas</u>, the Supreme Court specifically denounced our holding.").  In <u>Cunag</u>, the Defendant obtained a hotel room under false pretenses using forged documents, similar to the situation here where Defendant appears to have obtained the rental car under false pretenses through the use of a driver's license that was not Defendant's. <u>See</u> <u>Cunag</u>, 386 F.3d at 894 (noting that "as the district court found and as the clear, uncontested evidence demonstrates—he used fraud.  During the suppression hearing, through documentary evidence, declarations of the hotel manager, and cross-examination of Cunag himself, the prosecution easily carried its burden to prove that Cunag was unlawfully in the room," as "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (internal quotations and citations omitted).

However, as the Defendant emphasizes, the Ninth Circuit in <u>Cunag</u> also noted that "the rule is that even if the occupant of a hotel room has procured that room by fraud, the occupant's protected Fourth Amendment expectation of privacy is not finally extinguished until the hotel justifiably takes affirmative steps to repossess the room."   <u>Id.</u> at 895 (internal citation and quotations omitted); <u>see also</u> <u>United States v. Bautista</u>, 362 F.3d 584, 590 (9th Cir. 2004) ("It is undisputed in this case that the motel's manager took no affirmative steps to repossess the room once she learned that it had been reserved with a stolen credit card.  To the contrary, she simply

asked the police to investigate the matter, and would have evicted Bautista only if he later failed to provide either a satisfactory explanation . . . While Bautista, in effect, had yet to pay for the room, the manager did not know that he could not pay for the room.  Until she made that determination and asked the police to evict Bautista, he was still a lawful occupant who retained a legitimate expectation of privacy in the room.").  Defendant argues that he had a reasonable expectation of privacy because Enterprise gave Defendant permission to use the vehicle, he provided payment, and while the permission may have been "premised on a misunderstanding as to Mr. Anderson's true identity . . . Enterprise took no affirmative steps to repossess the vehicle prior to law enforcement's search."  (ECF No. 46 at 5.)

First, the Court needs not explain in detail that while the expectation of privacy remains within a vehicle, there are differences in the level of privacy a person is entitled to in a vehicle versus something like a hotel room.  Rakas v. Illinois, 439 U.S. 128, 157 (1978) ("Though the reasonableness of the expectation of privacy in a vehicle may be somewhat weaker than that in a home . . . [a] search even of an automobile, is a substantial invasion of privacy."); New York v. Class, 475 U.S. 106, 114–15 (1986) ("While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police."); United States v. Young, 573 F.3d 711, 716 (9th Cir. 2009) ("Part of what a person purchases when he leases a hotel room is privacy for one's person and one's things.").

In Bautista, the defendant paid for a motel room with a stolen credit card and the Ninth Circuit found that the defendant nonetheless maintained Fourth Amendment protection in the room because his occupancy had not been lawfully terminated by the motel at the time of the search.  Bautista, 362 F.3d at 590.  In addition to involving a hotel room, rather than a vehicle located within the parking lot of a federal government facility as here, there are other facts that make this case distinguishable from Bautista.  The defendant in Bautista rented the room in his own name, and the Ninth Circuit noted twice that the motel manager would have permitted the defendant to remain in the room, even after his use of the stolen credit card, if the defendant simply had provided another means of payment, and law enforcement officers conducted no

investigation of the defendant's use of the stolen credit card before entering the room and had no probable cause to believe he had engaged in any criminal activity.  Bautista, 362 F.3d at 586-87, 590-91.  The Ninth Circuit felt "[t]he critical determination [was] whether or not management had justifiably terminated Bautista's control of the room through private acts of dominion."  Id. at 590.  Because the manager did not ask the ask the officers to evict the defendant but simply to investigate the matter, the court concluded that the management continued to recognize the defendant's privacy rights and thus, defendant had standing to challenge the search.  Id.

The Ninth Circuit's decision in Cunag is more applicable to these circumstances, given Cunag used false information to rent the hotel room, a false phone number, address, and employer name, and forged documents related to the credit card of another person.  Cunag, 386 F.3d at 889.  Referring to the Supreme Court statement in Rakas that a thief has no reasonable expectation of privacy in an automobile he has stolen, the Ninth Circuit further held that "Cunag procured his room through deliberate and calculated fraud. Like the driver of the stolen car, Cunag was not a lawful occupant," and stated that "when an individual is not legitimately on the premises, he does not enjoy the protection afforded by the Fourth Amendment."  Id. at 893.

The Court's conclusion that Defendant did not have a legitimate expectation of privacy in the vehicle is supported by the Ninth Circuit's decision in United States v. Caymen, 404 F.3d 1196, 1200 (9th Cir. 2005), which upheld the search of a computer obtained through fraudulent use of a credit card.  Thus, unlike the previous cases which discussed the expectation of privacy within a hotel where a person may be essentially living, this case dealt with the search of an item of moveable property stolen or obtained through the use of fraud.  The Ninth Circuit concluded that "[t]he Fourth Amendment does not protect a defendant from a warrantless search of property that he stole, because regardless of whether he expects to maintain privacy in the contents of the stolen property, such an expectation is not one that 'society is prepared to accept as reasonable.' "  Id. at 1201 (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979).  The Ninth Circuit also noted that there is "no ground on which to distinguish property obtained by fraud from property that was stolen by robbery or trespass."  Id.; see also Byrd v. United States, 138 S. Ct. 1518, 1529–30 (2018) ("No matter the degree of possession and control, the car thief would not have a

reasonable expectation of privacy in a stolen car.").

Here, the preponderance of the evidence demonstrates that Defendant Anderson fraudulently obtained the rental car, which means his possession of the vehicle was unlawful. Cunag, 386 F.3d at 894 (noting that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (internal quotations and citations omitted). During the evidentiary hearing, Officer Munoz recalled finding a wallet in the vehicle near the driver's seat, a picture of which was introduced as Government's Exhibit 5. Munoz testified that the wallet contained an Arizona driver's license for an individual named Mitchell Alvarado. Munoz testified that a Lieutenant Gilbreth contacted Enterprise rental because the keychain for the car identified Enterprise, and Munoz testified this occurred approximately a few minutes after the search was ongoing. Gilbreth told Munoz that the vehicle was rented to a Mitchell Alvarado, and Enterprise provided contact phone numbers for Mitchell Alvarado. Munoz tried calling the phone numbers, which resulted in Defendant's cell phone ringing located on the dash board in the vehicle, and this gave concern to Munoz of whether Defendant properly was in possession of the vehicle since Mitchell Alvarado was not present. Following the arrest of Defendant, the vehicle was not released, but kept on property secure and locked. As a part of the investigation, Munoz was provided with documentation from Enterprise rental showing the car was rented under the name of Mitchell Alvarado, and when presented with a surveillance photo from Enterprise showing the person that drove the rental vehicle from the rental lot, Munoz confirmed that the individual driving the vehicle was Defendant Anderson. The photo does not show anyone else in the vehicle.

On the other hand, when asked how Defendant came to be driving the vehicle the day of the incident, Defendant appeared evasive, answering with a dismissive or sarcastic answer that he was using his hands and feet. In the reply briefing, Defendant does not directly dispute that he obtained the rental vehicle using an identification that was not his, but rather argues that even if Defendant procured the vehicle by fraud, he maintained an expectation of privacy given Enterprise gave him permission to use the vehicle by accepting payment and handing over the keys, and even if the permission was "premised on a misunderstanding as to Mr. Anderson's true

identity . . . Enterprise took no affirmative steps to repossess the vehicle." (ECF No. 46 at 5.) The Court does not find this argument persuasive as there is "no ground on which to distinguish property obtained by fraud from property that was stolen by robbery or trespass." <u>Caymen</u>, 404 F.3d at 1201; <u>see</u> <u>also</u> <u>Byrd v. United States</u>, 138 S. Ct. 1518, 1529–30 (2018) ("No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car."). Further, as explained above, this case is distinguishable from the hotel room cases which require affirmative steps to repossess the room prior to losing an expectation of privacy.

Therefore, the Court finds that Defendant lacks standing to challenge the search of the rental car since he fraudulently obtained the vehicle. As mentioned above, while the Court finds that the Defendant did not have a reasonable expectation of privacy in the vehicle, given the fact that the supplemental opposition was filed late, the Court now turns to additional and alternative reasons as to why Defendant's motion to suppress shall be denied.

## C. Defendant's Motion to Suppress

Aside from the standing issue raised in supplemental briefing and addressed in the previous section, Defendant raises six main arguments in briefing in support of the motion to suppress: 1) Defendant was "seized" within the meaning of the Fourth Amendment when officers first approached the vehicle; 2) officers lacked reasonable suspicion to believe that Defendant was engaged in criminal activity at the time of the initial seizure; 3) even if the initial encounter could be deemed consensual, Woodard seized Defendant without reasonable suspicion when Woodard ordered him to get out of the vehicle; 4) Woodard lacked reasonable suspicion to believe Defendant was armed and dangerous; 5) the officers lacked probable cause to search the vehicle; and 6) Detective Janca violated Defendant's Fifth Amendment rights when he interrogated Defendant after Defendant invoked his right to counsel. The Court addresses each of these arguments in turn, however combines arguments three and four into one section below.

### 1. <u>Whether Defendant was Seized when Officers First Approached the Vehicle</u>

Defendant argues that Woodard and Munoz seized him when they first approached the vehicle, given that Woodard stood at the driver's side door blocking Defendant's ability to exit

the vehicle, and resting his thumb on his weapon, <u>Orhorhaghe v. INS</u>, 38 F.3d 488, 495 (9th Cir. 1994) (finding a seizure where, among other facts, the officer placed his hand on his hip, thereby revealing his concealed firearm). (Mot. 5.) Defendant claims Woodard ordered him to not make "any quick movements" and to put his "hands on the steering wheel," <u>United States v. King</u>, 990 F.2d 1552, 1556 (10th Cir. 1993) (finding that the defendant was seized when the officer ordered the defendant "at gunpoint to place his hands on the steering wheel or else be shot"); <u>Orhorhaghe</u>, 38 F.3d at 495 ("[A] seizure can occur when the officer merely indicates by his authoritative manner that the person is not free to leave."). (Mot. 6.) Defendant argues that under these circumstances, a reasonable person would not have felt free to ignore the police presence and go about his business. (Mot. 6.)

The Government argues that when the officers received the tip from the volunteer regarding the suspicious men in the Cadillac, they had the right to investigate, and did so by approaching the two occupants and asked them questions about their identity and purpose of the visit. (Opp'n 8.) Here, the officers were on foot and the Government argues they did not block Defendant's movement, <u>United States v. Kim</u>, 25 F.3d 1426, 1430 (9th Cir.1994) (finding no seizure even where officer parked his unmarked car so as to block partially the egress of defendant's vehicle before asking defendant questions). (Opp'n 8.)

### a. Testimony at the Evidentiary Hearing

In reply, Defendant contends that as to the question of whether the initial encounter was a seizure, "it is not clear from the government's opposition brief that the government disputes any of these facts" that Defendant contends occurred, and because they failed to identify any specific factual dispute, the government has failed to demonstrate the necessity for an evidentiary hearing on this issue. Defendant asks the Court to decide the issue solely on the facts set forth in Defendant's brief and declaration. (Reply 2.) The Government, in its briefing, does appear to dispute Defendant's characterization of the incident in its description of the officers approaching the suspects and asking questions, both in its statement of facts and legal argument section, in addition to disputing the fact of whether Defendant was permitted to move his hands from the steering wheel or not given he showed the officers a picture of the veteran ID card on his cell

phone. (Opp'n 2, 8.) While the Government may not have painstakingly addressed the facts in specific detail as to the initial few seconds of the encounter, the parties clearly put forth differing interpretations of key significant aspects of the entire encounter, including the initial encounter.

At the evidentiary hearing the Court heard testimony regarding the initial encounter from Defendant Anderson, in addition to Officers Woodard and Munoz. Woodard testified that while conducting interior patrol, he and Munoz were approached by a VA volunteer who advised them that there were two suspicious individuals in a black vehicle in the parking lot. Woodard and Munoz approached the vehicle. While walking toward the car from the rear, Woodard saw the passenger Garcia looking back and Woodard noticed a letter "B" tattoo on Garcia's face which Woodard felt indicated association with the Bond Street subset of the Fresno Bulldog street gang. While the Court cannot speculate as to the difficulty of observing the "B" tattoo through the rear window of the car, the Court notes that Woodard's ability to see the tattoo when Garcia turns his head to the left is consistent with the placement of the tattoo, as the tattoo is on the left cheek of Garcia's face, and thus would be in the line of sight when Woodard approaches from the rear drivers side. (See Ex. C to Mot., ECF No. 38-3 at 4.)

Woodard testified that he approached Defendant at the driver's side of the vehicle, and asked Defendant if he could speak with him, to which Defendant said "sure." Woodard testified that he did not have his firearm drawn at the time, but did not recall precisely where his hands were. Woodard testified that he is left handed and wears his firearm on the left side of his body. When asked if it was "possible" that he had his hand on his firearm, Woodard stated no, he did not believe so. When asked if he remembered having his hand on the firearm, Woodard said no. When asked how he knows he did not have his hand on his firearm if he doesn't have a precise memory, and asked about typical practice, Woodard stated when he approaches a vehicle he usually has his hands hanging freely, or he rests his hands on his utility belt, which he conceded was near the firearm.

Woodard recalled the initial conversation with Defendant "was to the effect of attempting to identify who he was and what he was doing there at the VA," with the goal of determining if he was there on official business. Woodard recalled that Defendant had his phone in his hand

when Woodard was first approaching the vehicle, and Woodard testified that he never ordered Defendant to put his cell phone down or on the dashboard. Woodard recalled that Defendant had his cell phone in his hand the whole time during the initial encounter. Woodard was able to confirm Defendant was a veteran by observing a picture of Defendant's ID card on Defendant's phone. Woodard testified that he did not recall telling Defendant not to make any quick movements or ordering Defendant to put his hands on the steering wheel. Woodard recalled that Defendant did not have any identification, and Defendant provided his name and date of birth, and told Woodard he had a picture of the VA ID on his cell phone, which Defendant showed to Woodard.

Defendant Anderson testified that when Woodard first approached, he startled Defendant, and Woodard told Defendant not to make any sudden movements and to place his hands on the steering wheel, and Defendant complied by dropping the cell phone in his hand onto the dashboard on placing his hands on the steering wheel. Defendant testified that he observed Woodard had his thumb resting over the grip of his firearm, and his forefingers on the outside of the holster, while his other hand was on the other side of the belt. Defendant testified that he interpreted Woodard's statement as an order, not a request, and did not feel free to exit the vehicle at that time because Woodard was right next to the door, and did not feel free to drive away.

On cross-examination, when Defendant was asked about Woodard's and Defendant's testimony regarding the placement of Woodard's hands during the initial encounter, Defendant confirmed he clearly saw the officer's thumb on the grip of the gun, and fingers on top of holster. The Government asked if it was "possible" that Woodard's hands were simply resting on the belt, not the gun. Defendant responded that he saw Woodard's hand was clearly on backstrap of the firearm, and Defendant stated he has firearm training himself, and he sees a lot of officers do this. Defendant stated he remembered specifically this placement of the fingers on the firearm that day. The Government then asked if Woodard's right hand was over the gun, and Defendant said he could not say exactly which hand it was, because Defendant stated his viewpoint was from a combination of looking in the mirror reflection, and over the shoulder when the officer

said don't move. Defendant remembers clearly the hand was over the firearm.

The Court finds it significant that while Defendant testified that he had an explicitly clear recollection of the precise position of the officer's hands on the firearm, Defendant could not recall whether it was the right or left hand resting on the firearm, which Woodard testified immediately prior that he is left-handed and has the firearm on the left side of his utility belt. The Court reviewed the surveillance tape of the incident, and the distance and quickness make it difficult to discern the placement of the officer's hands. However, the Court notes that given the firearm was on the left side of the officer's body, it was on the far side of Defendant's viewpoint from the driver's side window, and given the very limited time where the officer approached the window, it appears it would be difficult to have a clear viewpoint of the officer's left hand and belt area either from Defendant's primary viewpoint from the seat, or his secondary view in the mirror, that he stated was his combined viewpoint that allowed him to observe the placement of the hands.

While Woodard stated he did not recall telling Defendant to not make any quick movements or to place his hands on the steering wheel, Woodard testified that the beginning of the encounter was casual and that he was asking investigatory questions to determine the purpose for which Defendant was at the VA, and Woodard testified that he never ordered Defendant to put his cell phone down or on the dashboard but recalled that Defendant had his cell phone in his hand the whole time during the initial encounter. This is consistent with both Woodard's and Defendant's testimony regarding confirming the purpose of the visit and Defendant showing Woodard the picture of his VA identification on Defendant's cellphone. While Defendant states he specifically recalls Woodard ordering him not to move and to place his hands the wheel, Defendant's testimony regarding the placement of Woodard's hands on the firearm similarly places this testimony in question.

**b.    Defendant was not Seized During the Initial Encounter**

A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19, n.16 (1968); see also California v. Hodari D., 499 U.S. 621, 625 (1991) (holding that a seizure occurs only when

an officer has applied physical force or the arrestee has submitted to the officer's show of authority). A seizure is effectuated through a show of authority "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Hodari D., 499 U.S. at 627-28 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (internal quotation mark omitted); see also Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988))). In determining whether this test is satisfied, courts look to factors such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554.

No seizure occurs when officers approach individuals on the street or in some other public place and putting questions to them if they are willing to listen. U.S. v Drayton, 536 U.S. 194, 200 (2002). A seizure does not occur simply because a police officer approaches an individual to make inquiries. Florida v. Bostick, 501 U.S. 429, 434 (1991). An officer may approach a person who is in a car parked in a public place, without that contact constituting a seizure if under the totality of the circumstances, a reasonable person would not believe they are free to leave. See United States v. Kim, 25 F.3d 1426, 1430 (9th Cir.1994) (finding no seizure even where officer parked his unmarked car so as to block partially the egress of defendant's vehicle before asking defendant questions). In Kim, the Ninth Circuit noted that while "police interrogation of automobile occupants typically involves a greater degree of intrusiveness than questioning of pedestrians and thus more readily impinges on the Fourth Amendment," where "officers come upon an already parked car, this disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense *ab initio*, except of his own volition." Kim, 25 F.3d at 1430.

If the officers had seized Defendant during the immediate initial encounter, the Court

would likely find that such seizure would not have been supported by reasonable suspicion, because in the record before the Court, there is simply no factual details concerning the substance of the tip from the VA volunteer regarding who the suspicious individuals in the car were, what they looked like, why their activities were suspicious, or any other facts that the Court can review to determine if there was reasonable suspicion at the time the officers were approaching the vehicle. "Reasonable suspicion requires 'specific, articulable facts' which, together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." United States v. Thomas, 211 F.3d 1186, 1189 (9th Cir. 2000) (quoting United States v. Jimenez–Medina, 173 F.3d 752, 754 (9th Cir. 1999)). Courts are to "uphold an investigatory stop based on a tip or other secondary information only when the information possess sufficient indicia of reliability that are independently corroborated by police." Thomas, 211 F.3d at 1190 (finding tip from FBI suggesting to pay particular attention to a certain house based on suspicion that there might be narcotics there, was devoid of specifics regarding occupants, vehicles, particular suspicious conduct, or kind of narcotics and thus the tip lacked any indicia of reliability and was too vague and generalized to play any part in the reasonable suspicion calculus). While the tip here was from a VA volunteer and not anonymous, and thus a factor that increases reliability, United States v. Rowland, 464 F.3d 899, 907 (9th Cir. 2006), there is simply not enough factual details to allow the Court to consider as an independent basis to establish reasonable suspicion prior to encountering the vehicle and then observing and interacting with the occupants. See Thomas, 211 F.3d at 1190 (Even if suspicious activity had subsequently been observed at the house, any finding of reasonable suspicion would have to rest on that observation alone and not, in whole or in part, on the FBI tip.").

However, based on the officers' and Defendant's testimony concerning the posture and circumstances of the initial encounter, the Court finds that by a preponderance of the evidence, a seizure of the Defendant did not occur at this point in the encounter. Officer Woodard's description of the initial encounter as a casual encounter where the officers asked basic questions attempting to ascertain the identity of the occupants of the vehicle and their purpose for being at the VA is an encounter that did not rise to the level of a seizure within the first few seconds of

the encounter.  Woodard testified that he approached Defendant at the driver's side of the vehicle, and asked Defendant if he could speak with him, to which Defendant said "sure."  See Kim, 25 F.3d at 1431 ("The phrasing of Agent Aiu's request for permission to question Kim left open the possibility of a refusal and the positions in which DEA agents were posted did not entirely bar Kim's egress.").  The issues affecting Defendant's credibility as to this point of the encounter weaken any attempt to overcome the testimony given by officer Woodard in this regard.

      2.     <u>Whether Officers Lacked Reasonable Suspicion to Believe that Defendant was Engaged in Criminal Activity at the Time of the Initial Encounter</u>

Defendant argues that at the time Woodard and Munoz approached Defendant's vehicle, the officers only knew that a VA volunteer thought Defendant and Garcia looked suspicious, and although a concerned citizen's tip may contribute to a finding of reasonable suspicion, such tip must contain some detail by which its reliability can be judged, <u>Alabama v. White</u>, 496 U.S. 325 (1990).  (Mot. 8.)  Defendant contends that the tip here, as set forth in the officer's reports, is completely void of detail, identifying neither the reason why the volunteer believed Defendant and Garcia looked suspicious, nor what type of criminal activity was afoot, and therefore the officers could only verify that there were two males sitting in the vehicle as reported, but had no basis to conclude that either person was engaged in criminal activity, and thus did not have reasonable suspicion for the seizure.  (Mot. 9.)

As in the previous section, the Government argues that when the officers received the tip from the volunteer regarding the suspicious men in the Cadillac, they had the right to investigate, and did so by approaching the two occupants and asked them questions about their identity and purpose of the visit.  (Opp'n 8.)  The Government also argues that the officers then almost immediately identified indicators of criminal activity, including the possible gang tattoos, Munoz smelling the odor of marijuana, the fact that Garcia admitted he might be on probation, and thus taken together with the informant's tip, the officers had reasonable suspicion that criminal activity was afoot and were within their rights to ask the occupants additional questions.  (Opp'n 9.)

In the previous section, the Court found that at the time of the initial encounter and prior to officer Woodard asking or ordering Defendant out of the vehicle, Defendant had not been seized by the officers, and therefore the officers did not need reasonable suspicion to ask the occupants of the vehicle basic questions about their purpose for being at the VA. At this point, the Court finds that only a consensual encounter had occurred, and hence, no seizure within the meaning of the Fourth Amendment.

     3.     Whether Officer Woodard Seized Defendant without Reasonable Suspicion when he Ordered Defendant Out of the Vehicle and Whether Woodard had Reasonable Suspicion to Believe Defendant was Armed and Dangerous

Defendant argues that even if the Court finds Defendant was not seized when Woodard initially approached the vehicle, Defendant was undoubtedly seized approximately five minutes later when Woodard opened the driver's side door, grabbed Defendant's arm, and ordered him out of the vehicle, United States v. Sokolow, 831 F.2d 1413, 1416 (9th Cir. 1987) ("Physically grabbing, moving, and seating a suspect to ask questions, even in public, clearly restrains that suspect's liberty in a nonvoluntary way."). (Mot. 9.) Defendant argues that while the officers may have had reasonable suspicion (if not probable cause) to believe Garcia was engaged in criminal activity, none of the indicia of criminal activity observed implicated Defendant given the odor was concentrated on Garcia's side of the vehicle, and while Garcia admitted he had drugs, Defendant specifically denied to Woodard that he had any drugs inside the vehicle. (Mot. 10.) Given this, Defendant contends that the only reason officers had to suspect Defendant of wrongdoing at this point was the company he was keeping, a Bulldog gang member who admitted to possessing marijuana, and the Supreme Court has rejected the notion of suspicion-by-association, Ybarra v. Illinois, 444 U.S. 85 (1979). (Mot. 10-11.) Defendant highlights that immediately upon removing Defendant from the vehicle and grasping his fingers, Woodard performed the pat-down search, however at that time, Woodard only knew that Garcia had a small bag of marijuana, as Woodard did not learn about the empty gun holster until after he performed the frisk, and Defendant argues the association with a suspect cannot be the only basis for suspicion. (Mot. 11.)

The Government argues that shortly after receiving the tip and approaching the vehicle, Munoz smelled the odor of marijuana and Munoz asked Garcia whether he had marijuana on his person to which Garcia admitted, and pulled out a bag of marijuana from his shirt.  (Opp'n 9.)  The Government argues that collectively, the tip about suspicious activity, Munoz smelling the odor of marijuana, seeing the possible gang tattoos, hearing Garcia admit he might be on probation, Garcia's admission of marijuana possession, and the bag found, the officers had probable cause to search the vehicle.  Prior to searching the vehicle, the officers ordered the occupants out of the vehicle, which they argue is permissible under Maryland v. Wilson, 519 U.S. 408, 410 (1997).

In addition to creating a limited exception to the warrant requirement for seizures, Terry also created a limited exception to the warrant requirement for searches, holding that "an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that 'the person[] with whom he is dealing may be armed and presently dangerous.' " United States v. I.E.V., 705 F.3d 430, 434 (9th Cir. 2012) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).  Just as with investigatory stops, a Terry frisk must be supported by "specific and articulable facts," such that a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Id. (quoting Terry, 392 at 21, 27) (internal quotation marks omitted).

At the evidentiary hearing, Woodard recalled that Munoz had asked Garcia to step out of the vehicle, Munoz had found the marijuana, and Munoz then asked Woodard to have Defendant step out of the vehicle.  Woodard testified that he asked Defendant if he could step out of the vehicle, and that Defendant agreed and exited the vehicle.  Woodard does not recall any physical contact between the time he asked Defendant to get out and when Defendant was out of the vehicle.  When asked, Woodard stated that he did not twist his arm, and does not recall grabbing Defendant's arm.  Woodard clarified that because of the tight confined space between the cars in the parking spaces, he may have touched his arm in a manner to avoid further contact or to prevent the car door from hitting another car.  After Defendant exited the vehicle, Woodard testified that he asked him if he could pat him down for weapons, and Defendant agreed.

1  Woodard said he did this for officer safety, and when asked, confirmed that the safety concern

2  was informed by the gang tattoo on Garcia's face.

3  Defendant testified at the hearing that he was told to get out of the car by Woodard, and

4  Woodard opened the vehicle door, and grabbed Defendant by the bicep area and told Defendant

5  to put his hands behind his back.

6  Although very difficult to see clearly because of the distance, Woodard's testimony

7  appears consistent with the Court's viewing of the surveillance footage in which it does not

8  appear that Defendant is grabbing and forcing Defendant out of the vehicle, but rather gives him

9  space for the door to swing open.  It is unclear who opens the door initially, but it appears that

10  Defendant is in control of the door as Defendant steps out and Woodard backs up to allow room

11  for Defendant, and then Woodard appears to have Defendant move back toward him to perform

12  the pat down frisk.

13  Munoz testified that as the officers approached the vehicle, Munoz observed that the seats

14  were low, and the passengers were low in their seats, which Munoz felt was a relevant

15  consideration in whether the activity was suspicious.  Munoz observed Garcia turned and looking

16  over his left shoulder, and Munoz observed a tattoo on the face, and Munoz decided to approach

17  the passenger side.  Based on his training and experience, Munoz felt Garcia's paw print tattoo

18  and "B" tattoo indicated affiliation with the Fresno Bulldog street gang.  Munoz recalled the

19  windows were down when he approached Garcia, and smelled the odor of marijuana.  When

20  Munoz asked if there was any marijuana, Garcia admitted he had marijuana.  Munoz also saw the

21  tip of a plastic bag sticking out of the front sweatshirt pocket.   Based on the smell, admission,

22  and bulge, Munoz felt Garcia had a significant amount of marijuana on his possession.  When

23  Munoz asked, Garcia stated he might be on probation.

24  Based on the totality of the circumstances at this point, including the smell of marijuana,

25  other indicia observed, the bag of marijuana, and the admission from Garcia, Woodard had

26  reasonable suspicion that Defendant was associated with criminal activity afoot in the vehicle

27  and could seize the vehicle and Defendant.  In fact, the Court finds the officers likely had

28  probable cause to support a search of the entire vehicle for contraband at this time.  <u>See</u>

1  Wyoming v. Houghton, 526 U.S. 295, 301-02 (1999) (noting that where probable cause exists to

2  justify search of a lawfully stopped vehicle, the probable cause justifies a search of every part of

3  the vehicle that may conceal the object of the search, making no distinction among packages or

4  containers based on ownership.).

5      Aside from this, officer Woodard testified that he asked Defendant if he would step out of

6  the vehicle, and asked if he could pat him down for weapons, and testified that Defendant

7  responded that he could pat him down.  Thus, the Court finds that the pat-down search was

8  consensual, and finds no reason to discredit Woodard's testimony in this regard.  However,

9  whether Woodard asked or ordered Defendant out of the vehicle at this point is irrelevant as at

10 the point Defendant exits the vehicle, Woodard had reasonable suspicion that Defendant may be

11 armed and dangerous given the smell of marijuana, the gang tattoos which both officers testified

12 as observing when walking up to the vehicle, the bag of marijuana observed, and the admission

13 from Garcia.

14      4.    Whether Officers had Probable Cause to Search the Vehicle

15      Defendant concedes the officers had probable cause to believe there was marijuana in the

16 vehicle at this point, specifically, on Garcia's person, however, argues that neither officer had

17 probable cause to believe that there was additional marijuana in the vehicle, as "probable cause

18 to believe that *some* incriminating evidence will be present at a particular place does not

19 necessarily mean there is probable cause to believe that there will be more of the same," United

20 States v. Weber, 923 F.2d 1338, 1344 (9th Cir. 1990).  (Mot. 14.)  Defendant further argues that

21 Munoz's alleged observation of the empty gun holster does not support a finding of probable

22 cause, because the item observed from a distance could easily have been anything from a cell

23 phone holder to a wallet to a luggage tag, and even if Munoz could have determined that it was a

24 holster, the presence of an empty gun holster in the absence of other factors does not suggest

25 there was a firearm in the vehicle (Mot. 14-15; Ex. G, ECF No. 38-3 at 12.)

26      The Government argues that even if they did not previously have probable cause after the

27 marijuana was discovered, taken together, the discovery of Garcia's marijuana, Munoz seeing

28 the holster, and the discovery of the methamphetamine pipe gave probable cause to search the

vehicle.  (Opp'n 9.)

The Supreme Court in <u>Wyoming v. Houghton</u> and in <u>California v. Acevedo</u> summarized the permissible scope of a search of a vehicle.  The Court in Acevedo stated the following:

> We conclude that it is better to adopt one clear-cut rule to govern automobile searches and eliminate the warrant requirement for closed containers set forth in *Sanders* . . .  "Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search of the entire cab." *Ibid.* We reaffirm that principle. In the case before us, the police had probable cause to believe that the paper bag in the automobile's trunk contained marijuana. That probable cause now allows a warrantless search of the paper bag. The facts in the record reveal that the police did not have probable cause to believe that contraband was hidden in any other part of the automobile and a search of the entire vehicle would have been without probable cause and unreasonable under the Fourth Amendment . . . We therefore interpret *Carroll* as providing one rule to govern all automobile searches. The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.

<u>California v. Acevedo</u>, 500 U.S. 565, 579-80 (1991).  The Wyoming v. Houghton Court further clarified the issue:

> *Ross* summarized its holding as follows: "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search." *Id.,* at 825, 102 S.Ct. 2157 (emphasis added). And our later cases describing *Ross* have characterized it as applying broadly to *all* containers within a car, without qualification as to ownership. See, *e.g., California v. Acevedo,* 500 U.S. 565, 572, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) ("[T]his Court in *Ross* took the critical step of saying that closed containers in cars could be searched without a warrant because of their presence within the automobile"); *United States v. Johns,* 469 U.S. 478, 479-480, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (*Ross* "held that if police officers have probable cause to search a lawfully stopped vehicle, they may conduct a warrantless search of any containers found inside that may conceal the object of the search") . . . In sum, neither *Ross* itself nor the historical evidence it relied upon admits of a distinction among packages or containers based on ownership. When there is probable cause to search for contraband in a car, it is reasonable for police officers-like customs officials in the founding era-to examine packages and containers without a showing of individualized probable cause for each one. A passenger's personal belongings, just like the driver's belongings or containers attached to the car like a glove compartment, are "in" the car, and the officer has probable cause to search for contraband *in* the car.

<u>Wyoming v. Houghton</u>, 526 U.S. 295, 301-02 (1999).

At the hearing, Woodard testified that after Defendant was out of the vehicle, during the pat down, Woodard felt a hard object with a bulbous end that he believed to be a methamphetamine pipe based on his training and experience.  When Woodard felt the item,

Woodard states that at that point Defendant nonchalantly said "it's a meth pipe." Woodard stated that Munoz made the decision to search the vehicle, and communicated such decision by announcing loudly to the occupants and to Woodard that a search of the vehicle was going to be conducted. After the announcement from Munoz, Defendant stated to Woodard that there was methamphetamine and ammunition in the driver's side door panel, which Woodard testified was not an unusual statement by an individual as he believed the Defendant likely thought the items were going to be discovered during the search anyways, and hence, admitted their presence.

Munoz also testified that he ordered Garcia out of the vehicle based on the fact that he was in possession of marijuana. As Garcia exited the vehicle, Munoz observed on the passenger floorboard, a brown leather holster, which Munoz knew from personal experience to be a handgun holster. Munoz's experience with the holster included looking to purchase one at one point, experience as an officer that he has seen them, and knows that the visible holes are to allow attachment to a belt. Munoz testified that as a law enforcement officer, he knew it was not simply a piece of leather, but a gun holster. Upon seeing the holster, Munoz signaled to Woodard to handcuff Defendant Anderson. Munoz removed the marijuana and placed it on the top of the vehicle, which he describes as contained within a larger than sandwich style bag size, and contained approximately twenty-eight grams based on a measurement taken, and about a softball size of marijuana. At this point, Munoz decided to conduct a search of the vehicle because he had reason to believe there were more drugs and possibly a firearm. Munoz felt there could be additional drugs because Garcia was in possession, there was another person in the vehicle, and often where there are drugs there are often firearms too. Munoz signaled Woodard to handcuff Defendant by making a hand signal, and then loudly announced he was going to conduct a search of the vehicle.

As noted above, Defendant testified that he was told to get out of the car by Woodard, and Woodard opened the vehicle door, grabbed Defendant by the bicep area and told Defendant to put his hands behind his back. At that point, Woodard grasped Defendant's fingers and told Defendant he was going to search for weapons, and searched Defendant near the rear passenger door, while facing the vehicle. Woodard felt the outside of the clothing, and Defendant stated

when Woodard felt the right pocket and asked Defendant what is this?  Defendant answered by stating "not a weapon."  Defendant says he answered like this because he was "kind of frustrated with the situation" and was just trying to get his VA ID, and felt the whole situation was unnecessary and was kind of a snarky remark.

Defendant denied telling Woodard "it's a meth pipe," and stated he would not use that term in normal speech, but rather would use terms such as "ratchet" or just "pipe."  On cross-examination, Defendant said he did not remember exactly how he responded, but "did not say it's a meth pipe for sure . . . I never referred to it as that, if anything I would have said pipe, if I was talking to an officer, but usually I say ratchet."  Based on this statement, the Government asked if in a formal setting with an officer, you might have said "pipe," Defendant said it was "doubtful" because he was so "irritated," and testified that he knew he first made the comment to Woodard that it was "not a weapon."  However, in the <u>Terry</u> frisk, Officer Woodward was permitted to determine what the object was and hence once the item was removed from the pocket the officer could clearly see it was a methamphetamine pipe, which added to the probable cause to search the vehicle.[5]

Based on the marijuana found, the holster on the ground, the methamphetamine pipe found on Defendant, and the admission by Defendant that there was methamphetamine and ammunition in the car,[6] the Court finds there was probable cause to justify the search of the vehicle without a warrant.  Hence, the officers' conduct did not violate the Defendant's Fourth Amendment rights as the officers made an initial consensual encounter which then lead to a <u>Terry</u> seizure and frisk which ultimately lead to probable cause to search the vehicle.

5.     <u>The Fifth Amendment Invocation of Right to Counsel</u>

Defendant argues that, as stated in his declaration, he unambiguously and unequivocally

---

[5]  Whether the Defendant said it was rachet or meth pipe or methamphetamine pipe is really irrelevant since the Defendant does not even remember what he said and Officer Woodard testified that based on his training and experience, he knew the item to be a pipe based on the bulbous shape on one end of the item, and thus because the item was immediately apparent to be contraband based on the plain feel of the item, the seizure of the item from Defendant's person was proper.

[6]  Even without the Defendant's admission that there was ammunition and methamphetamine in the vehicle, there was still probable cause to search the vehicle based upon the other indicia described herein by the Court.

invoked his right to counsel after he was first read his <u>Miranda</u> rights, as while he was in handcuffs watching officers search the vehicle, an officer approached him and read him his rights from a card. (Mot. 16.)  In response, Mr. Anderson stated, "I'm not going to talk without an attorney."  (<u>Id.</u>)  Given this statement, Defendant argues that a reasonable law enforcement officer would understand that he did not wish to proceed without the presence of counsel, yet Detective Janca nevertheless interrogated Defendant without the presence of his lawyer for nearly an hour and ten minutes.  (<u>Id.</u>)

The factual summaries put forth in the parties' briefing differ as to whether Defendant invoked his right to counsel when he was first read his <u>Miranda</u> rights by Woodard.  However, at least on the face of the briefing, there does not appear to be a dispute between the parties as to what statements should be suppressed.  Defendant only requests that the Court suppress Defendant's statements made to Detective Janca during his interrogation.  (Mot. 16-17.)  While not precisely stating when Defendant invoked his right to counsel, the Government argues that "statements made by Anderson prior to his invocation of his right to counsel are admissible . . . includ[ing]: (1) his statement that the object in his pocket was a 'meth pipe,' and (2) his statement that he had meth and ammunition in the car."  (Opp'n 10.)[7]  However, the Government concedes that any statements made by Defendant after invoking his right to counsel are inadmissible, and states these include: "(1) his statement regarding possessing keys to the black container on his keychain, and (2) his statements to Officer Jenca [sic]."  (Opp'n 10.)

Thus, there appears to be no dispute in the briefing that Defendant's statements made to Detective Janca should be suppressed, and Defendant has not moved for any additional statements to be suppressed other than those made to Detective Janca.  This absent of dispute was confirmed at the April 26, 2019 hearing where the Government stipulated its agreement that statements made to Detective Janca should be suppressed as violative of Miranda.  Accordingly, the Court will grant Defendant's motion to suppress as to the statements made to Detective Janca.

---

[7]  The Court understands that the Defendant denies that the statements were in fact made which the Court noted at the suppression hearing would be an issue at trial with the Court judging the credibility of the witnesses  to determine whether in fact such statement were made and what was said.

### D.    Inevitable Discovery

The Government argues that even if the officers did not have probable cause to search the vehicle, the seized evidence is admissible under the inevitable discovery doctrine because during the encounter with Defendant, officers were investigating the ownership of the car, and argues the officers would not have released the car until they knew it was lawfully possessed.

The inevitable discovery doctrine "permits the admission of otherwise excluded evidence if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." United States v. Reilly, 224 F.3d 986, 994 (9th Cir. 2000) (internal quotations and citation omitted). The Government must make this showing by a preponderance of the evidence, and it "can meet its burden by showing that the evidence would have been uncovered by officers in carrying out routine procedures." Id.

Here, as discussed previously above, the preponderance of the evidence demonstrates that Defendant Anderson fraudulently obtained the rental car, which means his possession of the vehicle was unlawful. Further, given officer Munoz's testimony regarding his concern about Mitchell Alvarado being a potential victim given the presence of the wallet in the vehicle, the Government has shown that the evidence would have been uncovered by the officers carrying out routine procedures. Therefore, the inevitable discovery doctrine provides an additional and independent reason for the Court to deny Defendant's motion to suppress the physical evidence seized.

## IV.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1.    Defendant's motion to strike Defendant's opposition (ECF No. 40) is DENIED;

2.    Defendant's motion to strike Defendant's supplemental opposition (ECF Nos. 44, 46) is DENIED; and

3.    Pursuant to the stipulation of the Government made at the April 26, 2019 hearing, Defendant's motion to suppress (ECF No. 38) is GRANTED IN PART as to any

statements made by Defendant to Detective Janca on December 20, 2018; and

4.    Defendant's motion to suppress (ECF No. 38) is DENIED IN PART as to all other aspects of Defendant's motion.

IT IS SO ORDERED.

Dated:   __**May 15, 2019**__

UNITED STATES MAGISTRATE JUDGE